Nos. 19-1600 (L) & 19-1602

---

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

_____

SABEIN BURGESS,

*Plaintiff-Appellee/Cross-Appellant*,

*v.*

GERALD GOLDSTEIN,

*Defendant-Appellant/Cross-Appellee*,

and

BALTIMORE POLICE DEPARTMENT, et al.,

*Defendants/Cross-Appellees*.

_____

On Appeal from the United States District Court
for the District of Maryland
Civil Case No. RDB-15-0834—Richard D. Bennett, *Judge*.

---

**OPENING/RESPONSE BRIEF OF**
**PLAINTIFF-APPELLEE SABIEN BURGESS**

---

Jon Loevy
  *Counsel of Record*
Gayle Horn
Steven Art
Theresa Kleinhaus
LOEVY & LOEVY
311 North Aberdeen Street
Chicago, Illinois 60607
(312) 243-5900
jon@loevy.com

October 4, 2019

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**
**DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS**

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 19-1600     Caption: Burgess v. Goldstein and Baltimore Police Department, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Sabein Burgess
(name of party/amicus)

who is _____ appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?  ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?  ☐ YES ☑ NO
      If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Jon Loevy        Date: 10/04/2019

Counsel for: Plaintiff-Appellee, Sabein Burgess

## CERTIFICATE OF SERVICE
**************************

I certify that on _____10/04/2019_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Jon Loevy            10/04/2019
   (signature)                          (date)

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES.................................................................... 1

STATEMENT OF THE CASE..................................................................... 1

SUMMARY OF THE ARGUMENT ........................................................... 10

ARGUMENT ............................................................................................ 11

I.  THERE WAS NO ERROR IN THE JURY INSTRUCTIONS, MUCH LESS ANY THAT COULD JUSTIFY A NEW TRIAL ................... 11

    A.  Goldstein Was Not Sandbagged at Trial...................................... 12

    B.  The District Court Did Not Misinterpret Or Misapply Its Own Summary Judgment Order................................................. 20

    C.  At A Minimum, The Little Man Issue Was Tried by Consent .... 20

    D.  Goldstein Has Identified No Erroneous Ruling .......................... 21

    E.  The Refusal to Give Goldstein's Proposed Limiting Instruction Was Not Erroneous ................................................. 23

II.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN REJECTING GOLDSTEIN'S HEARSAY OBJECTION ................. 29

    A.  Standard of Review ..................................................................... 29

    B.  The District Court's Ruling ......................................................... 30

    C.  The Court Did Not Abuse Its Discretion in Applying Rule 807 to the Memos' Final Paragraph............................................... 31

    D.  Defendants Had Sufficient Notice to Satisfy Rule 807.............. 34

    E.  Rule 807 Notwithstanding, The Final Paragraphs of Exhibits 121 and 122 Were Independently Admissible Under Other Hearsay

i

Exceptions, Including as a Party Admission ...................................... 36

F.   Because Goldstein Claimed He Obtained The Information From
Sources Other Than The FBI, He Cannot Establish Any Prejudice... 37

III.   GOLDSTEIN'S CLAIMS OF ERROR ARE IRRELEVANT BECAUSE
THE *BRADY* CLAIM CAN BE AFFIRMED ON OTHER GROUNDS .. 38

IV.   GOLDSTEIN'S APPEAL FAILS BECAUSE EVEN IF HE OVERTURNS
THE *BRADY* CLAIM, THE JUDGMENT CAN BE INDEPENDENTLY
AFFIRMED BASED ON THE OTHER THREE CLAIMS PLAINTIFF
WON ........................................................................................................ 39

A.   Legal Standard .............................................................. 39

B.   The Jury's Malicious Prosecution and IIED Findings
Independently Support the Judgment ................................................. 40

C.   The Jury's Fabrication Verdict Also Independently Supports the
Judgment ............................................................................................. 43

V.   GOLDSTEIN'S RULE 50 SUFFICIENCY OF THE EVIDENCE
CHALLENGE REGARDING THE DUE PROCESS CLAIMS WAS
PROPERLY REJECTED ................................................................... 44

A.   Standard of Review .................................................... 44

B.   The Record Sufficiently Supported the Jury's Conclusion That
Goldstein (1) Was Aware Of But Suppressed Brian Rainey's
Exculpatory Information, And Also (2) Fabricated A Report
Misrepresenting And Concealing Brian's Status As A Witness ........ 44

C.   Separate and Apart from the Brian Rainey Evidence, There Was
Sufficient Independent Support for the *Brady* Verdict ..................... 52

VI.   THE VERDICT WAS NOT THE PRODUCT OF BIAS, SYMPATHY, OR
THANKSGIVING ............................................................................. 60

BURGESS' CROSS-APPEAL ..................................................................... 61

VII.   DISMISSAL OF THE *MONELL* CLAIMS WAS IMPROPER ........ 61

ii

A. Procedural History ........................................................... 62

B. There Was No Basis to Dismiss the *Monell* Claims .................... 63

CONCLUSION ................................................................. 67

# TABLE OF AUTHORITIES

*Albright v. Oliver,* 510 U.S. 266 (1994) .................................................. 40

*Amato v. Saratoga Springs*, 170 F.3d 311 (2d Cir. 1999) ............................. 66, 170

*Atlas Food Sys. & Servs., Inc. v. Crane Nat. Vendors, Inc.,* 99 F.3d 587
    (4th Cir. 1996) ............................................................... 39

*Belk, Inc. v. Meyer Corp.*, 679 F.3d 146 (4th Cir. 2012) ......................................... 24

*Campbell-Ewald Co. v. Gomez*, 136 S.Ct. 663 (2016) ............................................ 63

*Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714 (7th Cir. 2003) ...................... 21

*Christopher Phelps & Associates, LLC v. Galloway*, 492 F.3d 532
    (4th Cir. 2007) ............................................................... 26

*Dennis v. General Elec. Corp.*, 762 F.2d 365 (4th Cir. 1985) ................................. 22

*Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) .................................................... 47

*Gallick v. B & O R.R. Co.,* 372 U.S. 108 (1963) ...................................................... 43

*Gentry v. E. W. Partners Club Mgmt. Co.*, 816 F.3d 228 (4th Cir. 2016) ............... 26

*Gilbert v. Scratch 'n Smell, Inc.*, 756 F.2d 320 (4th Cir. 1985) .............................. 44

*Gosnell v. Sea-Land Serv., Inc.,* 782 F.2d 464 (4th Cir. 1986) ............................... 43

*Greater Baltimore Center for Pregnancy Concerns v. Mayor and City Council of
    Baltimore*,
    721 F.3d 264 (4th Cir. 2013) ........................................... 64

*Griffin v. United States,* 502 U.S. 46 (1991) ........................................................... 38

*Int'l Ground Transp. v. Mayor & City Council of Ocean City*, 475 F.3d 214
    (4th Cir. 2007) ............................................................... 65

iv

*Jimenez v. City of Chicago*, 732 F.3d 710 (7th Cir. 2013) ...............................22, 25

*Juniper v. Zook*, 876 F.3d 551 (4th Cir. 2017) ........................................................13

*Kyles v. Whitley*, 514 U.S. 419 (1995)....................................................................29

*Manzanares v. Albuquerque*, 628 F.3d 1237 (10th Cir. 2010)...............................67

*Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339 (4th Cir. 2014) ..........................60

*Monell v. Department of Soc. Srvs.*, 436 U.S. 658 (1978)................................62, 65

*Noel v. Artson*, 641 F.3d 580 (4th Cir. 2011) .........................................................25

*Ortiz v. Jordan*, 562 U.S. 180 (2011) .....................................................................20

*Owen v. City of Independence*, 445 U.S. 622 (1980) ..............................................66

*Page v. Barko Hydraulics,* 673 F.2d 134 (5th Cir. 1982) ...........................................34

*Price v. City of Charlotte, N.C.*, 93 F.3d 1241 (4th Cir. 1996) ..............................44

*Puckett v. United States*, 556 U.S. 129 (2009) ........................................................19

*Reeves v. Sanderson Plumbing*, 530 U.S. 133 (2000) .............................................49

*Republican Party of N. Carolina v. Martin*, 980 F.2d 943 (4th Cir. 1992).............64

*Rivers v. United States,* 777 F.3d 1306 (11th Cir. 2015) ...........................................34

*Ruvalcaba v. Los Angeles*, 167 F.3d 514 (9th Cir. 1999).......................................67

*Sandberg v. Virginia Bankshares, Inc.,* 891 F.2d 1112, 1122 (4th Cir. 1989)........38

*Spell v. McDaniel*, 824 F.2d 1380 (4th Cir. 1987)..................................................23

*Stamathis v. Flying J, Inc.*, 389 F.3d 429 (4th Cir. 2004) .......................................57

*Swanigan v. Chicago*, 775 F.3d 953 (7th Cir. 2015) .........................................63, 66

*Talkington v. Atria Reclamelucifers Fabrieken BV,* 152 F.3d 254 (4th Cir. 1998).43

*Teague v. Bakker*, 35 F.3d 978 (4th Cir. 1994) ........................................................23

*Thomas v Cook County Sheriff's Dept,* 604 F.3d 293 (7th Cir 2010)......................39

*United States v. Agurs*, 427 U.S. 97 (1976)............................................................45

*United States v. Caro*, 597 F.3d 608 (4th Cir.2010)................................................26

*United States v. Clarke,* 2 F.3d 81 (4th Cir. 1993) ..................................................32

*United States v. Cole,* 631 F.3d 146 (4th Cir. 2011) ...............................................33

*United States v. Dinkins,* 691 F.3d 358 (4th Cir. 2012)...........................................29

*United States v. Farah*, 475 Fed.Appx. 1 (4th Cir. 2007) .......................................37

*United States v. Ford,* 88 F.3d 1350 (4th Cir. 1996) ...............................................31

*United States v. Hager*, 721 F.3d 167 (4th Cir. 2013).............................................28

*United States v. Heyward,* 729 F.2d 297 (4th Cir. 1984) ........................................35

*United States v. Hughes*, 716 F.2d 234 (4th Cir. 1983)...........................................48

*United States v. Lewis,* 53 F.3d 29 (4th Cir. 1995)..................................................27

*United States v. Mandel*, 591 F.2d 1347, 602 F.2d 653 (4th Cir. 1979) .................36

*United States v. Moore,* 824 F.3d 620 (7th Cir. 2016) .............................................31

*United States v. Ruffin,* 575 F.2d 346 (2d Cir. 1978) ..............................................35

*United States v. Simmons,* 773 F.2d 1455 (4th Cir. 1985).......................................33

*United States v. Slatten,* 865 F.3d 757 (D.C. Cir. 2017) ..........................................34

*United States v. Turner*, 718 F.3d 226 (3d Cir. 2013)..............................................36

*Wearry v. Cain*, 136 S. Ct. 1002 (2016) ................................................53

*Westmoreland Coal Co. v. Sharpe,* 692 F.3d 317 (4th Cir. 2012) .........................37

## STATUTES AND OTHER AUTHORITIES

Fed. R. Evid. 803 ................................................................32

Fed.R.Civ.P. ............................................................40, 64

*Weinstein's Fed. Evid.*, § 807.04 ..........................................34

# STATEMENT OF THE ISSUES

**Goldstein's Appeal**

1.   Whether the district court properly found sufficient evidence to support the jury verdict.

2.   Whether the trial court's abused its discretion in making a single hearsay determination and, even if that were so, whether any resulting error could have caused sufficient prejudice to justify a new trial.

3.   Whether the court committed reversible error by declining to also specifically instruct the jury about what evidence (supposedly) was not part of Plaintiff's claims, even where the district court correctly concluded that it was.

**Burgess' Cross-Appeal**

4.   Whether the Court erred in dismissing Plaintiff's *Monell* claim.

# STATEMENT OF THE CASE

A jury trial commenced on November 11, 2017, and lasted eleven days. More than a dozen witnesses testified, and hundreds of documents were admitted. The record evidence is summarized as follows.

**Michelle Dyson's Murder**

In 1994, Michelle Dyson was living with her children at 2703 Barclay in Baltimore. In early October, Dyson told her father, Ron Dyson, they needed to meet because she was in some trouble. *J.A.1247-48.*

That meeting never happened. Instead, on the evening of October 5, 1994, Howard Rice and Charles Dorsey paid a visit to Ms. Dyson's home. *J.A.1495-96, 2555; Supplemental Appendix ("S.A.") at 327-29.*

Rice was a serious drug dealer and a professional hit man and serial killer. *J.A.2512-15, 2551-61.* The FBI had reason to believe he was involved in up to 50 murders. *J.A.2513.* Within a three-mile radius of Ms. Dyson's home, Rice was suspected of killing nine people over a two-year period, many of them women. *J.A.700, 2551-61.*

On the night in question, Ms. Dyson allowed Rice and Dorsey into her home, after which they got into an argument. Rice ordered Ms. Dyson down into the basement, where he proceeded to execute her, firing one gunshot through her temple and another into her chest. *J.A.1495-96, 1498, 2555; S.A.327-29.*

From the stairway balcony, Dyson's six-year-old son, Brian Rainey, saw his mother arguing with the two men in the entryway. He did not know their names, but recognized one as a scary man from the neighborhood. *Id.* Afraid, Brian ran back to his bed and got under the covers. A bit later, he heard the gunshots. *Id.*

**Sabein Burgess**

Sometime thereafter, the Plaintiff, Sabein Burgess, arrived at Ms. Dyson's home. The two had been dating for several months, and got along very well. Burgess also enjoyed good relationships with Ms. Dyson's children, including Brian. *J.A.704-06*.

Burgess and his friend Dwight Holmes had been at Ms. Dyson's home watching movies on the day in question, but had left earlier that evening and visited a number of places.[1]

Upon returning, Burgess discovered the front door unlocked. Investigating, he found Ms. Dyson's body in the basement and he ran out of the house to get help. He asked a neighbor to call 911, and then returned to Ms. Dyson's basement and cradled her head until help arrived. *J.A.707-09*.

**Detective Goldstein**

The first responding Baltimore Police Department (BPD) officer directed Burgess upstairs, and placed him in handcuffs. *J.A.802-03*. Other officers soon arrived, including Defendant Detective Gerald Goldstein, who immediately took charge of the scene and assumed responsibility as the lead case detective. *J.A.875, 926,1297*.

---

[1] Goldstein's characterization of Burgess' alibi as "inconsistent" is inaccurate. Though he disclosed more of his activities from that day at his deposition years later, his alibi was, and remains, consistent. *J.A.805-08*.

Rainey was interviewed by the police and told them what he had seen. Having been found with the body, Burgess was in handcuffs at the time, and the police asked Brian if his mother's boyfriend (Burgess) had been involved in what Brian saw. *J.A.1496-97*. Brian told them no. *Id*. When he later created his reports, Goldstein falsely reported that Brian had slept through the entire encounter. *J.A.876-77,2458*.

### Burgess' First Arrest and Interrogation

Even though Goldstein now acknowledges he lacked probable cause to arrest Burgess, he did so anyway and interrogated him. *S.A.116-19*. Goldstein held Burgess overnight, in handcuffs. Wanting to help the police, Burgess answered every question. He told Goldstein he had nothing to do with Ms. Dyson's murder, which was true. *J.A.710-21*.

### The Lehmann Note

Within days, the victim's father, Ron Dyson, started calling the BPD to communicate information he learned about the crime. No one would call him back, so he eventually demanded to speak to a supervisor. *J.A.1274*.

Sergeant Lehmann took the call, and made notes. Among other things, Lehmann's notes state that young "Bryan" may have "witness[ed]" the events, including a direction to "get down [to the] basement." The notes further memorialize that Mr. Dyson's mother-in-law received a call from a witness at the local jail claiming that the murder had been committed by "Little Man." *J.A.2517-18*.

## Goldstein's Investigation

Lehmann passed his notes to Goldstein for follow up. Goldstein was the only detective assigned to the case. He alone was responsible for this investigation. *J.A.926,1193; S.A.107-08.*

For Goldstein, this "wasn't a whodunit." *J.A.912-14.* For the month following the murder, he conducted virtually no investigation. Besides Burgess, he never considered anyone who might've been involved or had a motive. *Id.*

Goldstein claims he never spoke to Brian about what he saw, nor any other family members or friends to inquire why someone might have wanted to kill Ms. Dyson. *S.A.252.* Despite his professed belief this was a domestic murder, Goldstein claims he never interviewed Dyson's children to learn more about her relationship with Burgess or what happened earlier on the day of her murder. *S.A.145-47.*

## Burgess' Arrest and Murder Charge

In early November, a BPD technician told Goldstein over the phone that Burgess' hands tested positive for gunshot residue (GSR) particles. *J.A.920.*

It is undisputed that GSR transfers easily, and that a person's hands can acquire GSR simply by touching someone who has been shot, or even just being in a room with GSR in the air. *J.A.839-43.* Goldstein was aware that the GSR technician knew nothing about the facts of the case, including that Burgess had been touching the victim in a small enclosed basement filled with gunshot smoke. *J.A.915.*

On November 9, Goldstein prepared an application of murder charges. He arrested and interrogated Burgess again, and Burgess again strenuously maintained his innocence. Goldstein then submitted the application of charges to the State's Attorney's Office, and testified against Burgess before a grand jury. On November 9, the prosecutors approved first degree murder charges. *J.A.2352-55*.

## Additional Suppression by Goldstein

On November 10, the day after Goldstein sought Burgess' arrest warrant, an FBI Agent called the BPD and informed the case detective for the Dyson homicide that the FBI had received information about the crime. The FBI agent communicated that two black males (one identified by name) assisted by a black female, had killed Ms. Dyson. The agent also provided a motive, namely, that Ms. Dyson had been killed over a blown package of drugs and/or money. *J.A.2509*.

During this same conversation, the FBI Agent also communicated to the Dyson homicide case detective the names of multiple witnesses with knowledge of the motive and background events. These witnesses included the father of one of Ms. Dyson's children "who knows. . . about the background of Dyson's killers," and her babysitter, who reportedly heard conversations leading up to the murder. A second FBI memo states that the FBI Agent had back in October previously transmitted further information to the case detective for the Dyson homicide about the babysitter and the murder. *J.A.2510; S.A.107-08*.

6

Other than creating a handwritten note with names and addresses of the witnesses referenced above, Goldstein documented none of the substantive information transmitted to him by the FBI, at least not in any documents that made it into the official file. *J.A.2484*. Goldstein also failed to communicate any of this information to the prosecutor, or to anyone else. *S.A.223-24*.

## Burgess' Murder Trial

Aside from GSR, which had limited evidentiary value, no physical evidence was presented at Burgess' trial. There was also no murder weapon, even though the State had no theory for how Burgess allegedly eluded the comprehensive search of the area. Goldstein never developed any motive (no witness could testify that Burgess and the victim ever exchanged a cross word) and no motive was suggested. *S.A.145-47,150-51,165*.

The only witnesses against Burgess at the criminal trial were (a) two BPD officers who responded to the scene and observed the body; (b) the coroner, who confirmed the victim was dead; (c) a ballistics technician, who confirmed that a bullet had killed her; (d) a neighbor, who testified Burgess ran to her house and told her to call 911 because Dyson had been shot; (e) the GSR technician; and (f) Goldstein. *J.A.1399-1406; S.A.145,147,150-51,165*.

Goldstein provided the most important evidence. He testified that he typed up what he claimed was Burgess' verbatim interview statement, an account which was

supposedly incriminating. *J.A.2491-95,2522-23*. According to Goldstein, when they originally went over Burgess' story, the first thing he allegedly stated was that he opened the front door, smelled smoke, *J.A.2492*, and immediately ran next door to tell the neighbor that Ms. Dyson "had got shot." *J.A.2505*. The State used this statement to argue in closing (as did Goldstein again at our trial) that this proved Burgess knew Dyson "had been shot" before discovering her body. *J.A.2528-29*.

Goldstein's characterization of Burgess' witness statement was false. As another detective admitted for the first time at the civil trial, there had been what he called a "pre-interview," during which the detectives went through the events with Burgess without recording his answers. *S.A.304,321-23,325*.

Based on the foregoing evidence, Burgess was convicted of first-degree murder. During sentencing, Burgess told the judge he was innocent. Noting lack of remorse, the judge gave him life plus twenty years. *J.A.722-28,2114*.

## Goldstein's *Mens Rea*

BPD Detective Robert Patton testified that during the year after Burgess was convicted, Patton received a memo from the FBI detailing a murder spree by Howard Rice. *J.A.663-67,2551-61*. This FBI memo referenced an account by Rice's then-girlfriend (Denise Wilson) that Rice confessed to her concerning the Dyson murder. *J.A.2555*. This FBI memo, *which was introduced at trial without objection, J.A.663*, states in part:

8

Howard [Rice] killed a girl named Michelle Dyson on October 5, 1994 at her residence at 2703 Barclay Street. Wilson stated that this was a contract killing. . . Dyson's boyfriend got blamed for it and was sentenced to life plus twenty years.

*J.A.2555.*

Detective Patton testified that he gave this memo to Goldstein, the lead Dyson detective, for Goldstein to investigate and inform the Dyson prosecutor as Goldstein saw fit. *J.A.701-02.*

Though he denied receiving it,[2] Goldstein admitted he did not communicate this information to the prosecutor. *J.A.898-99.* Instead, Goldstein did absolutely nothing, told no one, and gave the memo to no one, even while Burgess (who never learned about any of this until discovery in this civil litigation) remained in prison for nearly two more decades. *Id.*

**Burgess' Exoneration**

Burgess served 19.5 years in prison under truly horrific conditions, and he suffered immeasurably. *E.g., J.A.797-98.* Never giving up on proving his innocence, Burgess appealed and sought legal assistance. Burgess eventually filed a petition for writ of actual innocence, which was granted without objection by the State, and Burgess was released. *J.A.2114.* He then brought this lawsuit seeking redress.

---

[2] Goldstein disputed Detective Patton's testimony that he gave Goldstein the information, but the jury obviously could have believed Patton over Goldstein.

# SUMMARY OF THE ARGUMENT

This is an unusual appeal in that it was previously briefed and argued, only to be dismissed prior to adjudication for lack of jurisdiction.

At the prior oral argument, the Court did a good job of not tipping its hand. The Court seemed genuinely interested, however, in arguments that, from Plaintiff's perspective, should not have gotten any traction. The Court's apparent concerns were based on several important misunderstandings that Plaintiff very much wished he had done a better job of clearing up. Candidly, and in retrospect, Plaintiff's counsel assumed too much familiarity with the background, and should have better assisted the Court with the relevant context.

As it turned out, Burgess and the Court now have another opportunity to get to the right result. And Goldstein has no one to blame but himself for this second round of consideration. After Plaintiff informed this Court there was no jurisdiction for Goldstein's prior appeal, Doc. 11, Goldstein inaccurately represented that there was jurisdiction. Doc. 20 at 1. He made that representation despite knowing (and representing to the district court) that jurisdiction was lacking, R.418, necessitating dismissal and this new appeal.

Burgess is by no means suggesting he believes the Court was going to reverse the jury's verdict. But now that the issues are properly before this Court, this Brief does a much better job of addressing the issues the Court appeared to find troubling.

10

Burgess acknowledges that courts do not routinely re-examine appellate issues once considered. However, the Court's fundamental goal, as always, must be to reach the correct result, particularly in a case of this magnitude. If the Court was previously not inclined to accept Burgess' position (and Burgess hopes and expects that it was) then Burgess respectfully implores the Court to keep an open mind and consider this new appeal and this new Brief on the merits. The stakes for Burgess could not be higher. If the Court simply remains open to considering the additional context and background provided below, the appeal will be easily resolved.

## ARGUMENT

### I. THERE WAS NO ERROR IN THE JURY INSTRUCTIONS, MUCH LESS ANY THAT COULD JUSTIFY A NEW TRIAL

In all likelihood, no one was more surprised than Goldstein that this throwaway argument at the end of his brief seemed to have caught this Court's attention. It should not have. If anyone was in position to know whether Plaintiff's trial arguments were inconsistent with Judge Bennett's rulings, that would be Judge Bennett. Having presided over the case for three years, resolved summary judgment, and then sat through trial, the extremely experienced trial court was properly positioned to evaluate whether there was any genuine problem here. The court had no difficulty determining there was not.

Goldstein's contention otherwise relies on confusion and misdirection, and takes unfair advantage of this Court's (unavoidable) lack of context. Closer examination confirms that there was no error.

### A.     Goldstein Was Not Sandbagged at Trial

Plaintiff apologizes to the Court in that his prior briefing provided insufficient background. To properly assess this argument, several steps backward are required.

### The "Howard Rice" Summary Judgment Ruling

Defendants moved for summary judgment on the *Brady* count, arguing insufficient evidence. R.180. In response, Plaintiff identified several withheld pieces of information, including, most prominently, Rainey's status as a witness. R.195-1.

The district court concluded that Plaintiff's *Brady* claim survived. R.311. In narrowing things, however, the court granted summary judgment on one theory supporting the claim. Specifically, in two brief paragraphs in a 49-page opinion, the court's order granted summary judgment only "as to Plaintiff's *Brady* claim related to pretrial **Howard Rice** evidence." R.311 at 26 (emphasis added). The sole rationale for that discrete ruling was simple and straightforward: "Rice was a name Tayback [Burgess' criminal defense attorney] had pretrial." *Id*.

### Opening Statement

During openings, Plaintiff fully respected the court's Howard Rice summary judgment ruling. He talked quite a bit about Howard Rice's role in the underlying

murder, *J.A.641*; *S.A.62-65* (as did Goldstein's counsel, *S.A.81-82,*) but at no point suggested that the *Brady* claim was predicated on withholding Rice's name.

Plaintiff previewed, however, that his *Brady* claim included the allegation that Goldstein withheld the Lehmann Note. *J.A.635-36.* Among other things, the Lehmann Note indicates that a potential witness called the victim's grandmother from the Baltimore County Jail and told her that Little Man committed the crime. Under well-settled law, suppression of a possible alternative suspect can support a due process violation, as can (independently) the withholding of the opportunity to identify and interview this potential witness in jail with purported knowledge of this alternative suspect's guilt. *Juniper v. Zook*, 876 F.3d 551, 565 (4th Cir. 2017) (evidence pointing to alternative suspect can satisfy *Brady*).

Plaintiff's counsel laid out this Little Man *Brady* theory during opening. *J.A.635* ("Says it right in the notes: 'Little Man did it.'"). There was no objection. And properly so. The Court had never barred it.

If Defendants truly believed they were being sandbagged, they have never explained why they failed to object or raise the matter with the court after openings set parameters for trial. Quite the opposite, Goldstein's counsel's own opening discussed the Little Man evidence too. *S.A.74* (Goldstein's counsel: *"You'll hear lots about Little Man."*).

## Little Man *Brady* Violation Theory Throughout Trial

At the ensuing trial, Plaintiff's Little Man *Brady* theory occupied much of the jury's attention. All of this evidence went in without objection. Never once did Goldstein contend (even outside the jury's presence) that the summary judgment ruling was in any way implicated.

For starters, Goldstein was examined extensively--by both sides--about Plaintiff's contention that he suppressed the Little Man information. *See J.A.865, 905-06,1122*; *S.A.243-45* (admitting he did investigate Little Man lead); *J.A.901; S.A.231-32* (admitting there should have been a police report documenting the Little Man investigation); *S.A.233-34* (admitting he created no police reports about his efforts to investigate Little Man); *J.A.1123* (admitting he did not document his Little Man leads in writing). Goldstein's counsel's examination covered this same ground too. *J.A.1074-79, 1093 ("Let's talk about the investigation of Little Man first."). See also J.A.881-82* (putting the Little Man note on the jury's screen).

Critically, Goldstein admitted on cross-examination that he was constitutionally obligated to disclose that there was reason to believe there was an alternative suspect named Little Man. *J.A.1124-25*. Goldstein's boss (Sgt. Lehmann) likewise admitted the Little Man information should have been disclosed, and that it would have violated Burgess' rights to withhold it. *S.A.287-88*. Goldstein of course vehemently insisted that he turned over the Little Man note. But

it was not in the prosecution's file, and the prosecutor testified that no one disclosed the Little Man lead to her--and that she would have turned it over if they had. *J.A.1393*.

In addition to Goldstein, the Little Man suppression theory was featured prominently with nearly every liability witness at trial. For example, Ron Dyson testified that he provided Goldstein additional information about Little Man, such as the identity of the witness (Mae Amison) who took the Little Man call from the Jail witness, and information Dyson gathered from canvassing the neighborhood that Little Man liked to wear disguises. *J.A.1266-68*. None of this was memorialized or disclosed to Burgess. Similarly, Plaintiff's counsel elicited from Troy Williams (the victim's ex-boyfriend) that Goldstein asked him about Little Man, and there were no resulting reports or notes in the file about the conversation. *S.A.90-91*. *See also* *S.A.95* (Goldstein's cross-examination on the same point).

Lehmann testified that Goldstein did "an incredible job of trying to identify Little Man." *S.A.270-72*. While Lehmann tried to deny Goldstein was obligated to memorialize his Little Man investigation, BPD Officer Ritz admitted there should have been documentation about it--notes or reports--in the homicide file. *S.A.311-313*. Both sides' police practices expert witnesses opined about that subject too, reaching opposite conclusions. *J.A.1738-39,1768-69,1804*.

In sum, there is no dispute that the alleged Little Man evidence suppression occupied considerable attention at this trial. Meanwhile, there were zero objections to any of the foregoing testimony, nor any hint by Goldstein at any time during the entire trial that this theory somehow violated the summary judgment order.[3]

To be clear, this was not because Plaintiff pulled a fast one or because Defendants were asleep at the switch. The reason that the Little Man *Brady* theory was part of the trial testimony without objection was because the Little Man *Brady* theory was a perfectly reasonable *Brady* theory to pursue. If Goldstein had tried to raise an objection about why Plaintiff should not have been permitted to try to prove that (a) Goldstein withheld the Little Man alternative suspect lead; and (b) that it was at least arguably sufficiently material (especially after Goldstein admitted he had an obligation to disclose it), defense counsel would have been unable to articulate anything objectionable. Even on appeal, the only explanation for why it should've been barred is because Goldstein supposedly believed it was out of the case. The Court now having been provided the full context, that contention is not even remotely tenable.

---

[3] Notably, after Goldstein told the jury he didn't understand what he was being sued for, Plaintiff's counsel confronted him on the stand with the accusation that he was being sued for withholding, *inter alia,* Lehmann's Little Man note. *J.A.1105-06.* No one ever tried to suggest otherwise.

## The Howard Rice Ruling Was Respected

Recall that the limited pretrial "Howard Rice" summary judgment ruling was premised on the fact that Burgess' criminal defense attorney already considered that Howard Rice might be involved. That was the lone theory that the district court took out of contention, and the only rationale for doing so.

At no point during trial did Plaintiff contend, contrary to the summary judgment order, that Goldstein withheld Howard Rice's name in violation of *Brady*. Nor was there any risk of jury confusion. Quite the opposite, the parties stipulated at trial that:

> The criminal defense attorney for Mr. Burgess's criminal trial, Gordon Tayback, is now deceased. Prior to his death, Mr. Tayback testified in another proceeding that he was aware of the possible involvement of Howard Rice as the killer of Michelle Dyson. There is no dispute that Howard Rice is a name that Mr. Tayback had before trial. Mr. Tayback further testified that he raised that possibility with the detectives in the [BPD], *and that the detectives told him that they had investigated that possibility and determined that Mr. Rice could not have been involved.*

*J.A.867* (emphasis added).

Crucially, Defendants argued throughout trial that *Rice was not Little Man.* Starting with opening statement, Defendants' counsel established that Rice and Little Man were two different people: "I told you that Howard Rice is not Little-Man. In fact, every person who knew Howard Rice that will testify at this trial will say Howard Rice as was not Little Man." *S.A.74,81.* Defense counsel proceeded

to elicit the same from Burgess (*J.A.820*); Troy Williams (*S.A.95*); and Goldstein (*J.A.1093,1101-02*). No one ever testified otherwise.

Were there any doubt, both sides relied upon an FBI memo referencing Howard Rice and Little Man as two distinct and different people. Little Man lives on 33rd Street, and is Milton Tillman's cousin. *J.A.934, 251*.

To state the obvious, Plaintiff couldn't have violated any order precluding the Howard Rice identity theory if Little Man is not Howard Rice. *See* R.180 at 28 (Goldstein's summary judgment contention that "There Is No Evidence That Howard Rice Was 'Little Man'"). The Howard Rice summary judgment ruling thus did not bar consideration of Lehmann's Little Man note, which never mentions Rice at all. As the court explained in rejecting the post-trial motion: "Defendant's insistence at trial that 'Little Man' was not Howard Rice undermines his argument that Plaintiff's counsel's 'Little Man' arguments contravened this Court's Order, which assumed that 'Little Man' was a nickname for Howard Rice." R.413 at 28-29.

### The Instruction Conference and Closing Arguments

At the instruction conference, Defendants *for the very first time* urged the Court not to permit Plaintiff to rely on the Lehmann note's Little Man reference because the Rice identity theory was out of the case at summary judgment. *J.A.1913*.

The district court rejected this argument. Far from agreeing with Defendants' interpretation of its order, the court explicitly instructed the jury that the Little Man

Lehmann note (PX372) was in the case, and could be considered in evaluating the *Brady* claim. *See J.A.1955-57,1999-2000* (jury is instructed it can consider Lehmann Note [PX 372] for *Brady* claim). When Goldstein's counsel insisted that the jury should be told the "Little Man" portion of the note could not support a *Brady* claim, the court appropriately advised her that it was going to define a *Brady* violation, and if she thought the Little Man information did not satisfy that test, she should make that argument to the jury. *J.A.1916-20,1958-59.*

Closing argument followed, and Goldstein's counsel did precisely that. After Plaintiff made his argument (again, without any objection) about why the alleged withholding of the Little Man lead allegedly contributed to the *Brady* violation, *J.A.1978-79*, Goldstein's counsel made the opposite case. *S.A.354-55* (arguing Plaintiff failed to prove prosecutor didn't receive it). The jury agreed with Plaintiff.

In sum, Goldstein was hardly ambushed by the Little Man *Brady* theory. Indeed, it is Plaintiff who would have been sandbagged if the issue had been yanked from consideration after Goldstein failed to say one word after openings and during the entire trial about any purported inconsistency with summary judgment. *Puckett v. United States*, 556 U.S. 129, 134 (2009) ("Of course the contemporaneous objection rule prevents a litigant from 'sandbagging' the court--remaining silent about his objection and belated[ly] raising the error...").

## B. The District Court Did Not Misinterpret Or Misapply Its Own Summary Judgment Order

From its superior vantage point, the district court *"does not view counsel's arguments as an improper violation of [the summary judgment] court order."* R.413 at 29. Deference to the trial court on this sort of issue is particularly appropriate. Having presided over all pretrial proceedings and this lengthy trial, the experienced trial judge was best positioned to interpret its own summary judgment order. With more than a decade on the bench (plus a lengthy trial career as an AUSA) Judge Bennett is fully aware of how trials work. Even if this Court read the entire trial transcript, it is difficult to imagine how it could conclude it has more context about the interplay with Judge Bennett's summary judgment order than Judge Bennett did.

## C. At A Minimum, The Little Man Issue Was Tried by Consent

The absolute best Goldstein could hope to establish is that there was some ambiguity about whether summary judgment had been granted as to the Little Man reference in the Lehmann Note.[4] Regardless, "[o]nce the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary judgment motion." *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011). That is why

---

[4] Although the court's holding granted summary judgment only "as to Howard Rice evidence," the preceding paragraph in that order referred to the fact that Goldstein asked Burgess during his interrogation if he knew a Little Man. R.311 at 26. Leaving aside Plaintiff's (uncorroborated) then-hypothesis about whether Rice was Little Man, this single question posed by Goldstein to Burgess during his interrogation hardly forecloses a *Brady* claim regarding everything having do with Little Man.

instruction conferences are not typically convened until after the evidentiary record at trial is developed.

Moreover, new evidence is routinely discovered at trial, unknown at summary judgment, just as happened here. For example, Ron Dyson's testified that he told Goldstein that the Little Man alternative suspect was known for wearing disguises (which also happened to be true of Rice). *J.A.1268,2552-53*. The district court obviously could not have granted summary judgment on evidence that was not even known at the time of summary judgment. *Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714, 718 (7th Cir. 2003) ("Once the trial has taken place, our focus is on the evidence actually admitted and not on the earlier summary judgment record.").

### D. Goldstein Has Identified No Erroneous Ruling

All of the foregoing discussion is really just background. To justify a new trial on appeal, Goldstein must first identify an actual mistaken ruling by the trial court. Overturning a jury verdict is not a step taken lightly. Goldstein at a minimum has to identify an error. Goldstein has not, and cannot.

It was not error to permit Plaintiff to preview the Little Man note *Brady* theory in opening, and Goldstein does not suggest otherwise. Among other reasons, there were no objections that should, much less could, have been sustained.

Nor does Goldstein contend it was error to permit Plaintiff to elicit Little Man *Brady*-related evidence from Goldstein, Lehmann, Dyson, Ritz, and both sides'

police practices experts. Again, there were zero objections, which is really the end of it, but more to the point, the line of inquiry was entirely proper. Which of course is why it never occurred to Goldstein's counsel to object. It was plain to everyone at trial that no objection would have been sustained. To prove his *Brady* claim, Plaintiff was entitled to try to show that Goldstein suppressed information that might have helped Burgess' criminal defense, and Plaintiff did not contradict the summary judgment order.

Goldstein's appeal also does not attempt to identify any error concerning closing arguments. All Plaintiff's counsel did was argue the facts in the record, which is precisely what he was supposed to do. *Jimenez v. City of Chicago*, 732 F.3d 710, 717-18 (7th Cir. 2013) ("Since the supposedly new arguments were based on properly admitted evidence, Jimenez's counsel was entitled to argue the effect of the evidence in closing."). In any event, Goldstein's failure to object is dispositive. *Dennis v. General Elec. Corp.*, 762 F.2d 365, 366-67 (4th Cir. 1985). ("It is the universal rule that during closing argument counsel cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the comments to the jury were improper and prejudicial.").

Goldstein also concedes that the jury instructions as a whole were not erroneous. They properly define *Brady* violations, and appropriately advised the

jury what Plaintiff had to prove to establish one. *J.A.1999-2000.* That alone defeats Goldstein's position. *Spell v. McDaniel*, 824 F.2d 1380, 1395 (4th Cir. 1987) (where jury instruction is accurate, there is no error).

That leaves Goldstein's lone claim of error as the court's refusal to give his belatedly-tendered limiting instruction. The court made no error in that regard either.

### E.     The Refusal to Give Goldstein's Proposed Limiting Instruction Was Not Erroneous

The party seeking a new trial based on the jury instructions faces a heavy burden given the substantial discretion afforded the trial court to fashion the charge. *Teague v. Bakker*, 35 F.3d 978, 985 (4th Cir. 1994). To justify reversal, instructions "must necessarily have caused the jury to act in complete ignorance of, or to have misapplied, fundamentally controlling legal principles to the inevitable prejudice of an aggrieved party." *Spell*, 824 F.2d at 1399.

Facing that extremely high hurdle, this is not the extraordinary case where such relief is appropriate.

### 1.     Goldstein Failed to Proffer His Limiting Instruction for the District Court's Consideration

Goldstein tendered his proposed instructions a week before trial. R.324. He did not include the limiting instruction that is the subject of this appeal. *J.A.1609-57.* On November 19, after more than a week of Little Man testimony, Goldstein filed more instructions, again failing to propose the instruction at issue. R.349.

23

As the trial drew to a close, the court scheduled the jury instruction conference for November 20, the afternoon before closing arguments. *J.A.1890-1944*.

On November 20, Goldstein filed on the electronic docket a proposed limiting instruction that would have prohibited the jury from finding Goldstein liable "solely based" on the aggregate of six issues, one of which was withholding "exculpatory information relating to Howard Rice." *J.A.1659*. At the on-the-record instruction conference later that day, however, Goldstein did not mention his limiting instruction, much less proffer it for the court's consideration. *J.A.1890-1944*.

When Goldstein's counsel appeared in court the following morning before closing arguments, there were final discussions about the instructions. *J.A.1951-72*. Even then, Goldstein failed to mention the limiting instruction he'd filed the previous day. There is thus no record of the court ever addressing this limiting instruction at all, because it was never formally raised. That alone is dispositive. *E.g., Belk, Inc. v. Meyer Corp.,* 679 F.3d 146, 154 (4th Cir. 2012).

Stretching to preserve his objection, Goldstein cites to the transcript wherein the court rejected Goldstein's interpretation of the summary judgment order and decided to list the Lehmann Note on the *Brady* instruction as something the jury could consider, without restriction. Br. 50. But the court was never asked to rule upon his limiting instruction--and thus could not have erred in declining to give it.

### 2. Because It Is Undisputed That the Jury Was Accurately Instructed on Elements of a *Brady* Claim, There Can Be No Error in Declining to Also Instruct What Does Not Suffice

Even had Goldstein properly preserved his instruction, there would have been no error in refusing it. Where, as here, there is no dispute the jury received accurate instructions about what must be proven for a given claim, a court cannot commit error by declining to also tell the jury what evidence would not suffice. *Noel v. Artson*, 641 F.3d 580, 586-87 (4th Cir. 2011) ("This is what good jury instructions often do -- let counsel argue factually in terms of a legal standard, rather than having the judge make counsel's particularized arguments for them.").[5]

Goldstein is unable to cite a single case supporting the relief he seeks. He failed to locate any court, ever, awarding a new trial for failing to instruct the jury on what evidence should not be considered on a given claim. That is because the law is universally the opposite. *Jimenez*, 732 F.3d at 717-18 (rejected Goldstein's exact argument, holding: "[s]o long as the evidence supporting these theories was properly admitted, nothing warranted a jury instruction that would have prevented the jury from considering that evidence in resolving Jimenez's due process claim.").

---

[5] In rejecting a different instruction, the district court appropriately explained: "[M]y role is to have the jury instructed. My role is not to integrate every ruling I've made in this case on 47 motions *in limine* and my rulings on every summary judgment motion for lawyers to have all the language they want so a jury has not a clue what we're talking about. That's not the purpose of a jury instruction." *J.A.1932.*

### 3. Even Assuming It Was Erroneous Not to Give Goldstein's Instruction, Lack of Prejudice Defeats New Trial Request

"Even if a jury is erroneously instructed, we will set aside a verdict only if the error seriously prejudiced the challenging party's case." *Gentry v. E. W. Partners Club Mgmt. Co.*, 816 F.3d 228, 233 (4th Cir. 2016).

Here, even if the jury considered the "Little Man" portion of the Lehmann note or drew an inference that it related to Howard Rice, it could only find for Burgess if that evidence genuinely satisfied each element in the court's instruction: its exculpatory value had to qualify as "material," and it had to have been withheld from Burgess and not otherwise available through reasonable diligence. *J.A.2000-01*.

Jurors are of course presumed to follow the Court's instructions. *United States v. Caro*, 597 F.3d 608, 631 (4th Cir.2010). Thus, even assuming Goldstein were correct that Little Man (or Rice) evidence was nothing new or exculpatory to Burgess, Goldstein was not prejudiced by the jury being permitted to consider it. *Christopher Phelps & Assoc., LLC v. Galloway*, 492 F.3d 532, 539-41 (4th Cir. 2007) ("In short, the erroneous derivative work instruction had no operative effect on the jury's award and therefore was harmless"). As the court aptly noted, "[i]f the 'Little Man' reference in Plaintiff's Exhibit 372 was insufficient to support a due process claim, counsel simply wasted his breath." R.413 at 29.

At the last oral argument, the panel asked about *United States v. Lewis,* 53 F.3d 29, 34 (4th Cir. 1995), a case not cited by Goldstein, then or now. The case is distinguishable. In *Lewis,* the court's instruction did not accurately or completely summarize the law, failing to inform the jury that conspiring with a government agent is insufficient. *Id.* at 33-34. Additionally, the government in *Lewis* conceded that the instruction the court refused "was a correct statement of the law." *Id.* Our case is the opposite in both regards. Goldstein admits that Judge Bennett *did* accurately and comprehensively instruct the jury about the elements of the *Brady* claim (eliminating the type of clarification needed in *Lewis),* and Goldstein's proposed limiting instruction was inaccurate to boot.

In any event, it remains true that neither party, nor the Court, has been able to locate any case, ever, reversing a jury verdict for failing to instruct the jury what evidence it should not consider where that jury was otherwise properly instructed on the claim's elements. No such case exists.

> ### 4. Goldstein's Limiting Instruction Did Not Even Bar Consideration of Little Man Evidence, And Was Incoherent Regardless

There are three dispositive problems with the proposed instruction.

**First**, the instruction only mentions Howard Rice, and says nothing about Little Man or Lehmann's Note. *J.A.1659.* Goldstein thus not only failed to object to the Little Man evidence coming in, but he his proposed limiting instruction wouldn't

have prevented the jury from considering it. Actually, the instruction also does not even bar consideration of Howard Rice evidence--it allowed the jury to consider it on the issue of "bad faith." *J.A.165).*

**Second**, even for Rice, the instruction fails to accomplish what Goldstein intended. It references Rice as one of six different pieces of evidence, and instructs the jury that this set of six things, considered in the aggregate, cannot *"solely"* form the basis of a *Brady* violation. *Id*. But if the jury considered all six things (including Rice) *along with* the Brian Rainey or FBI information, then the instruction would be meaningless, because the "solely" qualifier would be nullified. Remanding the claim for a claim for a new trial with his proposed instruction would thus be futile.

**Third**, the instruction is inaccurate. Goldstein has never even attempted to explain why the jury couldn't have properly considered at least some of the five other non-Rice subjects prohibited by his instruction, including evidence relating to Charles Dorsey, the gunshot residue, Ray Handy, and the juvenile arrest outside Dyson's home. *If any one these other pieces of evidence was properly considered for any purpose (and Goldstein fails to show otherwise for any) then the instruction's aggregate construction renders it fatally inaccurate.* A court cannot err by refusing an inaccurate instruction. *United States v. Hager*, 721 F.3d 167, 184 (4th Cir. 2013).

Goldstein apparently intended to communicate that none of these six subjects,

including Rice, could *by itself* constitute a *Brady* violation. If that is indeed what he meant, it is certainly not what his proposed instruction says. Nor would it comport with the case law, which requires *Brady* material to be analyzed in the aggregate, not each piece in isolation. *Kyles v. Whitley*, 514 U.S. 419, 434-37 (1995).

Goldstein's prior reply Brief argued (and he thus may argue again) that the appropriate response to this deficiency "was not to reject the charge, as Burgess suggests, but to modify it." Doc. 51 at 24. But the court could not have erred in failing to fix an instruction that Goldstein never actually brought to the court's attention. 11 Charles Wright, Arthur Miller & Mary Kane, *Federal Practice and Procedure* § 2805 (2d ed.1995) (while "the giving or refusal of instructions" can generally support a new trial, "[a] principle that strikes very deep is that a new trial will not be granted on grounds not called to the court's attention during the trial ...").

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN REJECTING GOLDSTEIN'S HEARSAY OBJECTION

### A. Standard of Review

Given their proximity to the record, trial courts are afforded "significant discretion in making evidentiary rulings." *United States v. Dinkins,* 691 F.3d 358, 382 (4th Cir. 2012). Such rulings are reviewed for a clear abuse of that discretion, and overturned only if they are "arbitrary and irrational." *Id.*

## B.    The District Court's Ruling

At the prior oral argument, there seemed to be confusion about the use of FBI memos with five witnesses at trial. To clarify, virtually all of the FBI memos regarding Rice and/or Dyson were admitted and used without any objection or by agreement as joint exhibits, PX6 (*J.A.663-64*); PX124/DX260 (*J.A.934-35*); PX125 (*S.A.338*), or by the Defendants themselves. *E.g.,* DX 278 (*J.A.1812*). Far from objecting to them, Defendants' trial narrative relied on these FBI memos, including the hearsay within those memos recounting what the FBI discovered about the Dyson murder and Howard Rice. *Id.*

Goldstein's appellate argument concerns Exhibits 121 and 122, the only two FBI memos which were admitted over his objections. However, Goldstein's brief continues to obscure the reality that his hearsay objection was actually **sustained** for most of the contents. *J.A.626-27*. The court was unambiguous that the partially-redacted information about the Dyson homicide leads within those memos was hearsay, lacked sufficient reliability, and was not subject to any exception. *Id.*

In so ruling, the Court expressly suggested a limiting instruction informing the jury that the information shared with the BPD case detective (*i.e.,* exculpatory leads about the crime and its perpetrators) remain "subject to the hearsay rule, and are not being offered for the truth of the matter asserted therein in terms of who was where and in terms of this specific information that is presented." *J.A.626-29.*

Goldstein chose not to follow up on the court's offer to give that clarifying instruction. Any risk of juror confusion is attributable to his own strategy, and cannot be a basis for error. *United States v. Ford,* 88 F.3d 1350, 1363 (4th Cir.1996).

### C. The Court Did Not Abuse Its Discretion in Applying Rule 807 to the Memos' Final Paragraph

"The purpose of Rule 807 is to make sure that reliable, material hearsay evidence is admitted, regardless of whether it fits neatly into one of the exceptions..." *United States v. Moore,* 824 F.3d 620, 624 (7th Cir. 2016). Judge Bennett hardly conducted the Rule 807 analysis on the fly. This issue was first raised as part of summary judgment, then extensive motion *in limine* briefing, followed by lengthy pre-trial oral argument R.180 at 52-53; *J.A.247-59,604-27.* After carefully analyzing all of it, the court exercised its discretion in a manner that cannot be characterized as arbitrary or irrational.

To be clear, the only information from the only objected-to FBI memos admitted under the Rule 807 hearsay exception (and thus the only purported error) was the final paragraph, *J.A.2509,* which stated that the exculpatory information about the Dyson homicide contained in the FBI memos

> was furnished to Det. [redacted] / Det. [redacted] of the BPD-Homicide Unit (410) 396-2116. Det. [redacted] is the case detective and he advised that the information appeared to be accurate and resulted in leads on the case.[6]

---

[6] The last paragraph from the other FBI memo is worded differently, *J.A.2510,* but is analogous for purposes of this analysis.

The district court was well within its discretion to conclude that this paragraph (and only this paragraph) exhibited sufficient "circumstantial guarantees of trustworthiness" to qualify. *United States v. Clarke,* 2 F.3d 81, 83 (4th Cir. 1993) (Rule 807 "rejects formal categories in favor of a functional inquiry into trustworthiness" to ensure admission of "probative evidence relevant to the jury's truth-seeking role").

First, the court noted that the FBI produced these memos pursuant to subpoena, *J.A.614-15,618*, and Goldstein's counsel acknowledged their authenticity. *J.A.621,627-28*. The documents bear the FBI date-stamp and other official markings. *J.A.619*. As the court persuasively explained, every factor of the relevant test pointed strongly toward trustworthiness, including the agent's lack of incentive to lie, the voluntariness of the statement, and whether it was made on personal knowledge and contemporaneously transcribed *J.A.626-27. See also* Fed. R. Evid. 803 advisory committee note to 1972 Proposed Rules ¶ 6 (trustworthiness can be circumstantially inferred when a statement is made concurrent with a "duty to make an accurate record as part of a continuing job or occupation.").

Goldstein posits that perhaps this FBI agent simply made up this conversation with a fellow law enforcement officer, but the whole point of contemporaneously memorializing the who/what/when particulars while the information was fresh was to document it. This further supports the reliability finding. *United States v.*

*Simmons,* 773 F.2d 1455, 1458-59 (4th Cir. 1985) (holding ATF trace forms admissible under predecessor Rule 807 in part because there was no reason for them to be false).[7]

Moreover, additional circumstantial corroboration of reliability exists. Despite Defendants' forceful denials, Plaintiff proved that the phone number (410.396.2116) is in fact a phone number at which BPD detectives were reachable. *J.A.1132-33,2508.* Also, Goldstein was the case detective for Ms. Dyson's murder, *J.A.926, 1193; S.A.107-08,* and Goldstein took handwritten notes that closely tracked the information related in the memos. *J.A.2484.* The court's determination that this paragraph had sufficient indicia of trustworthiness could hardly be characterized as "arbitrary and irrational." *United States v. Cole,* 631 F.3d 146, 153 (4th Cir. 2011).[8]

---

[7] Bizarrely, Goldstein clings to his argument that the memo's final paragraph might actually be *"part of what the confidential informant told the Special Agent."* Br. 45 (emphasis in original). This reading is a stretch, to say the least. The paragraph goes on to state that when the "case detective" received this information, he "advised that the information appeared to be accurate and resulted in leads on the case," which only makes sense if the document is given its obvious reading, *i.e.,* a conversation between two law enforcement officers. *J.A.2509.*

[8] As stated, the court applied Rule 807 both ways. The same residual exception was also invoked for evidence important to Goldstein's defense (and his appellate facts) including the KKI record and the unsigned Social Services report containing, *e.g.,* Rainey's alleged statement via his grandmother via the therapist. *J.A.632-33.*

In the end, even assuming reasonable minds could disagree, this is not the sort of argument that could justify reversal because trial courts are vested with "considerable discretion to apply the residual hearsay exception" for important evidence. *United States v. Slatten,* 865 F.3d 757, 830 (D.C. Cir. 2017). For Rule 807, reviewing courts are "particularly hesitant to overturn a trial court's admissibility ruling" short of a "definite and firm conviction that the court made a clear error of judgment in the conclusion it reached based upon a weighing of the relevant factors." *Rivers v. United States,* 777 F.3d 1306, 1312 (11th Cir. 2015), quoting *Page v. Barko Hydraulics,* 673 F.2d 134, 140 (5th Cir. 1982). There can be no serious contention that Judge Bennett erred that badly, much less made any mistake at all.

### D. Defendants Had Sufficient Notice to Satisfy Rule 807

As for Goldstein's complaint that he did not receive the declarant's name and address, it is literally hornbook law that "[i]f the declarant's name and address are unknown despite reasonable efforts to locate the information, it is enough to give all the information the proponent has been able to acquire by diligent inquiry." *Weinstein's Fed. Evid.,* § 807.04[2]. Here, notwithstanding a court subpoena, the FBI was only willing to produce the memos in redacted form. *E.g., United States v. Simmons,* 773 F.2d 1455, 1458 (4th Cir. 1985) (manufacturer trace forms admitted under Rule 807 predecessor where employees' identity was unknown).

Relying on cases for the proposition that the notice requirement is "strictly" enforced, Goldstein confuses the issue. This is particularly unfortunate advocacy given that Burgess' prior brief pointed out that the "strictly enforced" notice cases he cites deal with notice *vel non* that the adverse party intended to use the evidence at trial, not the notice's sufficiency in terms of declarant names. Doc.37 at 48. *See United States v. Heyward,* 729 F.2d 297, 299 n.1 (4th Cir. 1984) (acknowledging "practical realities" sometimes "bar compliance with the letter of the [notice] rule"); *United States v. Ruffin,* 575 F.2d 346, 358 (2d Cir. 1978).

That case law supports Burgess' position. Congress' primary intent in inserting the notice requirement was to ensure that litigants were not "ambushed" at trial, and instead had an opportunity to prepare to meet the disputed evidence in advance. 5 *Federal Evid.* § 8:142 (4th ed.). Thus, "[i]f the adverse party is not taken by surprise, as may happen if the statement developed during discovery or came to the attention of the adverse party during discovery or motion, and if the adverse party expected the statement to be offered and was prepared to meet it, or had a realistic opportunity to prepare to meet it, the fact that notice ... was in some other respect inadequate may make little practical difference and may be for that reason excused." *Id.*

Here, there can be no dispute that Goldstein had sufficient notice of the documents and a fair opportunity to prepare. These memos were an important basis

for denying summary judgment, R.311 at 26-28, and as his unsuccessful motion *in limine* establishes, Goldstein knew they were going to be part of trial. That suffices. *United States v. Turner,* 718 F.3d 226, 234 (3d Cir. 2013) (admitting foreign bank records even where the declarants were unknown).[9]

### E. Rule 807 Notwithstanding, The Final Paragraphs of Exhibits 121 and 122 Were Independently Admissible Under Other Hearsay Exceptions, Including as a Party Admission

As the district court correctly concluded, the last paragraphs of the FBI memos are also independently admissible under FRE 803(6) and 803(8) as self-authenticating business and public records. *See* R.413 at 26-27 ("As required by both FRE 803(6) and 803(8), the circumstantial guarantees of trustworthiness for these official FBI memos were more than sufficient.") (citing cases).

These independent bases supporting admissibility are ignored (again) by Goldstein's appeal brief. Enforcing the resulting forfeiture is especially justified given that Goldstein had notice from the prior appellate briefing that Burgess relied on these exceptions, yet his brief elected to ignore them again. *Westmoreland Coal Co. v. Sharpe,* 692 F.3d 317, 338 (4th Cir. 2012).

---

[9] Defendants' heavy reliance on *United States v. Mandel,* 591 F.2d 1347, *vacated on reh'g,* 602 F.2d 653 (4th Cir. 1979) is misplaced. In reversing a Governor's criminal conviction secured in part on "[e]vidence based on rumors and general discussion" by unidentified declarants, some who were "long-time political enemies of the Governor," about a position he allegedly took in the "heat of a political battle where rumor, opinion and gossip abound," the court called this the "worst type of hearsay." *Id.* at 1369. That holding has no application here.

Moreover, there is an additional hearsay exception that defeats this argument --one not raised during the last round of briefing/argument. Specifically, the same hearsay paragraph that Goldstein claims was erroneously introduced under Rule 807 *was independently admissible as a party admission:* The FBI memo indicates that the BPD case detective (Goldstein) admitted "that the information appeared to be accurate and resulted in leads on the case." *J.A.2509*. Thus, FRE 801(d)(2)(A) is an independent basis for admitting this party admission, rendering any purported Rule 807 error moot. *United States v. Farah,* 475 Fed.Appx. 1, 9 (4th Cir. 2007).

## F.      Because Goldstein Claimed He Obtained The Information From Sources Other Than The FBI, He Cannot Establish Any Prejudice

Goldstein faced a big problem. His notes closely track the information about the Dyson murder contained in the FBI memos -- and uncannily so. *J.A.2124,2484, 2509-10*. Goldstein tried to explain away that inconvenient reality by claiming on the stand that he *independently developed the very same information that was allegedly relayed to him by the FBI. J.A.1152-55*.

That is game over for the hearsay argument. It means that the disputed representation in these memos (that Goldstein was allegedly told the very same thing by the FBI) was redundant. Goldstein admits he knew it anyway -- regardless of whether the jury did or did not believe that the FBI agent provided it to him again. The proposition for which Rule 807 was invoked (that an FBI agent relayed this

information to Goldstein) is thus superfluous. Any hypothetical error in admitting the FBI memos caused no prejudice, and cannot justify reversal.

Goldstein conceded on the stand that the information at issue is exculpatory, and that Burgess had a due process right to receive it. *J.A.930-32*. Goldstein also admitted he never turned over it over. *J.A.929*. That really is the end of it.

## III. GOLDSTEIN'S CLAIMS OF ERROR ARE IRRELEVANT BECAUSE THE *BRADY* CLAIM CAN BE AFFIRMED ON OTHER GROUNDS

Assume that Goldstein is correct that it was error not to instruct the jury that it couldn't find liability "based solely on" the Howard Rice, Charles Dorsey, Raymond Handy, juvenile arrest, "and" GSR testing evidence. Assume further it was error not to exclude the last two sentences of the FBI memos. Regardless, Plaintiff still wins the *Brady* claim.

The *Brady* verdict was a general verdict. This Court must affirm that verdict if any theory of liability supports it. *Griffin v. United States,* 502 U.S. 46, 49-60 (1991) (verdict is upheld where there is evidence sufficient to support one of multiple theories of liability); *Sandberg v. Virginia Bankshares, Inc.,* 891 F.2d 1112, 1122 (4th Cir. 1989), *overruled on other grounds,* 501 U.S. 1083 (1991) (applying the rule of *Griffin* to civil cases, and stating that "the submission of both correct and incorrect factual bases supporting a single theory of recovery is not grounds for reversal of a judgment on a general verdict").

Here, the *Brady* verdict is independently supported by the Brian Rainey evidence, the sufficiency of which Goldstein has failed to rebut, even assuming *arguendo* the jury also relied erroneously on Rice and the FBI. The judgment must be affirmed on that basis. *Thomas v Cook County Sheriff's Dept,* 604 F.3d 293, 305 n.4 (7th Cir 2010) ("Nor must we decide whether the evidence supported the other allegedly harmful policies or practices. The evidence supported the plaintiff's first theory of liability, and we can uphold the jury's verdict on that ground alone.").

## IV. GOLDSTEIN'S APPEAL FAILS BECAUSE EVEN IF HE OVERTURNS THE *BRADY* CLAIM, THE JUDGMENT CAN BE INDEPENDENTLY AFFIRMED BASED ON THE OTHER THREE CLAIMS PLAINTIFF WON

While resolution of the *Brady* claim can be characterized as a general verdict, that is not true of the jury's verdict as a whole. The jury also found for Plaintiff on each of three other independent claims, none of which turned on the FBI memo or the Howard Rice evidence. Any of those other verdicts supports the judgment, even if the *Brady* claim is for some reason reversed.

### A. Legal Standard

The relevant inquiry is not whether a jury verdict can be sustained on all of its grounds, but rather whether it "can be sustained, on any reasonable theory." *Atlas Food Sys. & Servs., Inc. v. Crane Nat. Vendors, Inc.,* 99 F.3d 587, 599 (4th Cir. 1996). In that regard, a verdict is not questioned for accuracy, or "correctness," but

for consistency. Fed.R.Civ.P. 49(b)(2) ("When the general verdict and the answers are consistent, the court must approve, for entry under Rule 58, an appropriate judgment on the verdict and answers.").

### B. The Jury's Malicious Prosecution and IIED Findings Independently Support the Judgment

In just a half-page of text, Goldstein urges the Court to vacate the jury's finding on the malicious prosecution and intentional infliction of emotional distress (IIED) counts. Br. 33-34. Goldstein's only argument is that they are supposedly legally indistinguishable from the due process *Brady* and fabrication counts. He is wrong. Unlike due process, malicious prosecution turns on initiating a prosecution maliciously, in the absence of probable cause, and IIED involves outrageous conduct. Litigants can certainly lose a due process claim, for example, yet win malicious prosecution. *E.g., Albright v. Oliver,* 510 U.S. 266, 268 (1994).

To be clear, Goldstein's post-trial motion raised specific challenges to the malicious prosecution and IIED verdicts, *J.A.2639-42*, and Burgess responded. The court agreed with Burgess on both counts. *J.A.2126-28,2133*. Goldstein has abandoned those arguments on appeal. Both claims should be affirmed because the record supports them.

40

### 1. The Record Supports the Jury's Finding About Absence of Probable Cause

In a case with virtually no evidence of Burgess' guilt, the key basis for probable cause was the type-written statement given by Burgess to Goldstein on the night on the murder. *J.A.2640*. As described *supra* at 7-8, Burgess' statement was not what Goldstein represented it to be, and thus did not support probable cause. On appeal, Goldstein does not to contend otherwise.

### 2. The Record Also Supports the Jury's Finding About Malice and Outrageous Conduct

Most centrally, Detective Patton testified that he gave Goldstein an FBI memo debriefing Howard Rice's girlfriend, Denise Wilson, who related that Rice confessed to her that he killed Dyson and that her boyfriend was being blamed for it. *See supra* at 8-9. Upon receiving this FBI bombshell from Patton, Goldstein buried it. He showed it to no one, told no one, and never shared it with Burgess' prosecutor, who never learned about it. *Id.* That is certainly malicious and outrageous.

There was additional evidence as well, including:

- Goldstein was forced to admit to the criminal court that he arrested Burgess without probable cause, even after originally trying to pass off the arrest/detention as voluntary. *S.A.122-25*;

- Goldstein claimed that he made Burgess wait in handcuffs for hours before questioning and held him over-night in an exhausted and traumatized state, all

because he'd already decided Burgess was going to lie. *S.A.261.*;

- Goldstein continued questioning Burgess, had him to sign the allegedly incriminating witness statement, and obtained a signed consent to search, all after Burgess had invoked *Miranda. S.A.135-37*; and

- Goldstein fabricated a story about having crawled under Burgess' truck and tapping the gas tank to confirm that it sounded hollow, all in order to resolve a problem for the State about the gas gauge being broken. *J.A.1137-39.*[10]

In response, Goldstein suggests there was a purported "agreement" by Burgess' counsel at the instruction conference that the claim "rise and falls" with the *Brady* claim, but this is misleading overstatement. As the conference went late into the evening, the only thing Plaintiff's counsel said was that the Court's denial of the Rule 50 motion on the *Brady* claim was sufficient to keep the malicious prosecution and IIED claims in the case as well. *J.A.1886.* But the converse is not true. Even if Plaintiff's *Brady* claim failed, he could still support malicious prosecution and IIED claims, which have entirely different elements. The Denise Wilson debriefing about Howard Rice's confession, for example, might not support a *Brady* claim (because

---

[10] Goldstein notes, correctly, that the court ruled that the gas tank misconduct was not a stand-alone constitutional violation, *J.A.1882-83*, but it is undisputed the court never blocked Burgess from arguing it was nevertheless relevant to Goldstein's *mens rea.* If anything, this further corroborates that Goldstein actually won every close call at trial.

Burgess was already convicted), but suppression could certainly prove outrageous malice. Plus, probable cause has nothing to do with *Brady*. An argument that Plaintiff's failure to win a *Brady* claim means he therefore could not win a malicious prosecution or IIED claim is legally frivolous.

The only substantive basis for overturning an entire jury verdict based on a partial infirmity of one finding is irreconcilable inconsistency. *Gosnell v. Sea-Land Serv., Inc.,* 782 F.2d 464, 468 (4th Cir. 1986). Where "there is a view of the case that makes the jury's answers to special interrogatories consistent, a reviewing court must resolve them that way." *Talkington v. Atria Reclamelucifers Fabrieken BV,* 152 F.3d 254, 261 (4th Cir. 1998). These other verdicts are not inconsistent, and thus suffice to uphold the judgment.

## C. The Jury's Fabrication Verdict Also Independently Supports the Judgment

Finally, even where the Court to reverse the *Brady* claim, the judgment can be independently sustained by the fabrication verdict. None of Goldstein's claimed trial errors impugn that verdict. *Gallick v. B&O.R.R. Co.,* 372 U.S. 108, 119 (1963) (courts must "attempt to reconcile the jury's findings, by exegesis if necessary . . . before we are free to disregard the jury's verdict and remand the case for a new trial.").

## V. GOLDSTEIN'S RULE 50 SUFFICIENCY OF THE EVIDENCE CHALLENGE REGARDING THE DUE PROCESS CLAIMS WAS PROPERLY REJECTED

As the district court correctly concluded, the jury's due process verdict was sound and well-supported. R.413 at 1-23.

### A. Standard of Review

"Because federal courts do not directly review jury verdicts, constrained, as [they] are, by the Seventh Amendment," a Rule 50(b) movant bears a "hefty burden in establishing that the evidence is not sufficient to support the awards." *Price v. City of Charlotte, N.C.*, 93 F.3d 1241, 1249-50 (4th Cir. 1996). "So far as sufficiency of the evidence ... is concerned, save for cases falling within a very small exception, the appeal is foredoomed to fail." *Gilbert v. Scratch 'n Smell, Inc.*, 756 F.2d 320, 320-21 (4th Cir. 1985).

### B. The Record Sufficiently Supported the Jury's Conclusion That Goldstein (1) Was Aware Of But Suppressed Brian Rainey's Exculpatory Information, And Also (2) Fabricated A Report Misrepresenting And Concealing Brian's Status As A Witness

Among other bases, the fabrication and the *Brady* claims both found ample support given the evidence regarding Brian Rainey, namely, that Goldstein knew and suppressed the fact Brian had exculpatory information, and fabricated police reports concealing the truth. As the court explained persuasively (*J.A.2119-23*), the jury did not act irrationally in reaching either or both conclusions.

### 1. The Evidentiary Record

There was almost no evidence implicating Burgess. Under those circumstances, any particular piece of exculpatory information more easily qualifies as constitutionally material. *United States v. Agurs*, 427 U.S. 97, 113 (1976) ("Whether evidence is material also depends on the strength of other evidence used in the criminal proceedings -- very little evidence might disturb an already-questionable conviction.").

Here, Brian's account that he saw two men who were not his mother's boyfriend order her into the basement before he heard gunshots is undoubtedly the type of thing which triggers *Brady.* Goldstein has never, and does not now, contend otherwise. He admitted at trial that there would have been a constitutional obligation to disclose that information. *J.A.869-70*.

Instead, Goldstein argues that no rational jury could have concluded that he was aware of Brian's information. The record permits other inferences.

First, Brian testified that he and his sisters were interviewed on the home's entryway couch by a white policeman. Brian told the officer what he saw and heard, and specifically responded to questioning about his mother's boyfriend (Burgess) by making clear Burgess, who he knew, was not involved. *J.A.1495-97*. Brian testified that he was unequivocal that neither man he saw that night was Burgess. *Id*.

Brian's sister, Tawanda Dyson, corroborated Brian's testimony. She recalled

the conversation with the police (and Brian's exclusion of Burgess) the same way. *J.A.1336-37*.

There was ample evidence in the record from which to draw a reasonable inference that Goldstein possessed this information, notwithstanding his denials. Multiple police witnesses testified that the case detective (Goldstein) would have been the one to speak to the children to determine if they were witnesses. *J.A.679-80,1294-97*. That alone permits the inference, but there was also undisputed testimony that if another officer spoke to a child witness and learned relevant information, that officer would immediately communicate that information to the lead detective--who, in this case, was Goldstein. *J.A.685-86*. Most damning, Goldstein himself acknowledged that if another officer on the scene had interviewed Rainey, any resulting information would have been shared with him. *J.A.875*.

Moreover, it was hardly a counter-intuitive inference that Goldstein would've wanted to speak to the children. In addition to learning what they may have seen/heard that night, they would have been important sources of information about the nature of the relationship between Goldstein's suspect and the victim.

At bottom, the interviewer had to be someone, and Burgess has evidence that it would have been unusual under these circumstances for it not to have been Goldstein, or at least that Goldstein would have been apprised. Litigants not uncommonly deny responsibility, but it was hardly irrational for the jury to draw the

pro-Plaintiff inference. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.").

There was other support too. Every crime scene officer who testified at trial specifically recalled *not* interacting with the children. *J.A.1294-96,1453; S.A.145*. Several obtained summary judgment on that basis. *J.A.535-41*.

Also, Goldstein staked his credibility on his purported memory that the children were gone by the time he arrived. His explanation for why he knew he did not speak to the children was that he was positive they had left. Hardly averse to testifying "I don't recall," virtually the only thing at trial Goldstein remembered with certainty was that the children were not present when he was. *S.A.145-47,150-51*.

However, it turned out that the police report upon which he relied for that "memory" was mistaken. *J.A.1450-51*. The report's author (Officer Skinner) testified that he inadvertently mis-transcribed the time the children had been transported; Skinner's trial testimony had the children overlapping with Goldstein at the scene for some fifty minutes. *Id*. Closing the loop, Goldstein admitted that if they had not yet left, he would have been in the children's presence because the house was too small not to have crossed paths. *J.A.1134-35,2120*.

Goldstein, in other words, got caught in a lie about never even being in the children's presence. The jury was entitled to take that into consideration. *United States v. Hughes*, 716 F.2d 234, 240-41 (4th Cir. 1983) (witness' false explanations are admissible to prove "guilty state of mind").

Finally, it is undisputed that Lehmann gave Goldstein the contemporaneous note from Ron Dyson indicating that Brian might have been a witness to someone directing his mother into the basement. *J.A.883*. In a case with zero other clues, the jury could well have concluded that Goldstein definitely would have followed up--unless he already knew what Brian had to say.

### 2. Goldstein's Post-Verdict Assessments of Brian's Credibility Are Entirely Misplaced

Knowing he cannot win unless this Court discounts Brian's testimony, Goldstein asks this Court to re-weigh Brian's credibility. He points out that Brian's two-decade old description of the scene apparently incorporated yellow crime scene tape that was possibly not present (depending on when the scene photos were taken). That Brian's memory might have incorrectly filled in a gap on that unimportant detail in no way disqualifies his memory that he told the police his mother's boyfriend was not one of the assailants. *See J.A.2130* (district court's conclusion that any inconsistencies "are reasonably excusable given the passage of over 20 years and the need for Mr. Rainey to recall a memory from when he was six years old.").

48

Likewise unavailing are Goldstein's arguments that the jury misjudged Brian's credibility because (a) Brian was once convicted of a crime involving a false statement; (b) he has a current friendship with Burgess; (c) his testimony contradicted an alleged hearsay statement attributed to (but never adopted by) his grandmother; and (d) only one of Brian's two sisters recalls being present when Brian made these statements to the police. These were all arguments made to the jury. An appellate court, having no opportunity to view witness testimony and demeanor, should not substitute its own judgment of witness credibility for that of the jury and the trial judge. *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 150-51 (2000).[11]

### 3. Goldstein's Invitations for This Court to Draw Different Factual Inferences from Those Drawn by the Jury Are Improper

In addition to attacking witness credibility, Goldstein also continues to argue facts and inferences. None of his arguments are persuasive.

---

[11] As he did at trial, Goldstein's Brief relies on a Kennedy Krieger Institute (KKI) record, admitted over Plaintiff's objection under Rule 807, containing a statement by a therapist who claimed to have heard from Rogers that Brian allegedly said that Burgess was involved in the crime. *J.A.2542*. Rogers never confirmed making such a statement to this therapist (or anyone else). Neither Rogers nor the therapist nor the report's author has ever given any confirming testimony at deposition, trial, or any other prior proceeding. Brian expressly denies having said this, and this same KKI record also contains Brian's own contemporaneous statement, which says no such thing. *J.A.2544*.

For example, ignoring the circular nature of his position, Goldstein contends that his and other police reports stating that the children were sleeping during the murder somehow prove that the children were sleeping during the murder. *See* Br. at 19 ("[E]very contemporaneous record indicates that all of the children were asleep. . ."). This argument is specious. The whole point of the alleged misconduct is that Goldstein actively concealed Brian's status as a witness by, *inter alia*, creating and encouraging false reports. Goldstein cannot legitimately rely on appeal on the report he created stating that Brian had no information because he was asleep.

Similarly, the DSS record to which Goldstein points proves nothing. Read in context, the record plainly indicates that the police provided information to the DSS employee, not the other way around. *J.A.2538-40* ("The officer reported.... [t]he children were upstairs asleep").

Goldstein next argues that Brian's recollection that he spoke to a police officer wearing a uniform necessarily proves beyond dispute that the officer could not have been Goldstein, who was plain-clothed. This was an argument Goldstein made to the jury, which didn't have to accept it. This happened 23 years ago, and Brian was very young.

Re-fighting other factual battles he already lost, Goldstein also contends that a rule requiring children to be interviewed only in the presence of a parent or guardian automatically forecloses an inference that he was part of Brian's interview or

learned of it. As Plaintiff understands the argument, Goldstein claims that because this interview may have been contrary to procedure, that means the interviewer was completely rogue or totally clueless, and therefore would have necessarily also ignored the practice of informing the lead detective about whatever he learned.

This is hardly the only possible inference to draw. Among other things, the argument ignores that Goldstein himself ran roughshod over proper procedures, admitting, for example, that he held Burgess overnight without probable cause, and that he procured Burgess' signature on the statement even after Burgess requested counsel. *S.A.118-26,135-36*. Goldstein also took no notes and created no reports concerning important witness interviews, such as those with Ron Dyson and another with the victim's former boyfriend who admitted exculpatory details. *J.A.879-80, 884-85,1081*. It was perfectly reasonable for the jury to conclude that Goldstein wasn't necessarily going to respect the formality of requiring permission to interview child witnesses immediately following a murder.

Finally, Goldstein points to a self-serving memory of a purported conversation with Brian's now-deceased grandmother, Joyce Rogers. There are no notes, reports, or other records corroborating that any such conversation occurred, much less any memorialization of what was supposedly said. *J.A.879-80,884-85*. Moreover, at his deposition, Goldstein confirmed having no memory of speaking to Rogers, and nothing in writing refreshed his recollection. *J.A.1109-10,1113-15*. His

convenient new trial memory that when he tried to follow up on the Lehmann Note reference to Brian being a witness, Rogers supposedly told him that Brian had been asleep was not credible in the face of that impeachment.[12]

This Court is obviously in no position to judge credibility or decide which factual inferences are most persuasive or which witness was more believable. The only question on appeal is whether the jury acted wholly irrationally in finding that the Brian Rainey (and other) evidence supported either a fabrication or a *Brady* claim. As Judge Bennett correctly concluded, this is hardly the unique and unusual case where the jury verdict was wholly unsupported. *J.A.2118-35*.

### C. Separate and Apart from the Brian Rainey Evidence, There Was Sufficient Independent Support for the *Brady* Verdict

Even were Goldstein correct about how the jury should have weighed the Rainey evidence and credibility, which he clearly is not, there were other bases to support this jury verdict. Each is independently sufficient.

---

[12] The point that Rogers did not want Brian coming forward was not disputed, including by Brian, who testified that his grandmother was very frightened to learn that Brian saw the two killers' faces. Having lost her daughter to murder, Rogers decided that Brian was not going to become involved in any prosecution. The family moved and had no further contact with Burgess, who thus never learned the information that Brian had disclosed during his interview that night. *J.A.1499*.

### 1. Goldstein's Suppression of the Lehmann Note Is Independently Sufficient

Sgt. Lehmann testified without contradiction that he gave Goldstein his handwritten note containing the lead that "child Bryan" might have "witness[ed]" the murder. A jury could reasonably conclude that the act of withholding the Lehmann note independently violated *Brady* because if the prosecutor or Burgess' lawyer had been provided a copy, further investigation would have revealed the truth: Brian had seen the killers and knew that Burgess was not one of them. *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) (newly-discovered evidence need only "undermine confidence" in the verdict).

Goldstein did not dispute receiving the Lehmann Note, or that it needed to be disclosed. *J.A.883,1124-25*. Instead, Goldstein's argument is that the jury should have believed his testimony that he provided a copy to the prosecutor.

That is not the only reasonable conclusion. While Goldstein did testify that he always copied every page of the entire file for the prosecutor, he was impeached. At his deposition, Goldstein had already admitted he couldn't say whether he copied the notes into the version of the file that he himself personally photocopied and brought over to the prosecutor's office--the exact opposite of both his trial testimony and his appellate position. *J.A.2131* (district court opinion, quoting Goldstein's deposition admission that: "I can't say for sure that the notes were copied").

Moreover, the prosecutor (Laura Brokaw) testified that she was never made aware of Brian's status as an exculpatory eyewitness. *J.A.1388-89,1392-93*. She further testified that had she been apprised by the case detective that there was an eyewitness, she would have remembered it, because she would have acted on that information, including disclosure to the defense. *Id*. Because she did neither, she concluded that this note and the information in it never came to her attention. *Id.; J.A.2121*.

Goldstein points to a different Brokaw note in the prosecutor's file, one that inculpates Burgess, suggesting that someone told Brokaw (falsely) that Brian was claiming that it was Burgess who directed his mother into the basement. As the district court properly concluded, this note hardly saves Goldstein. *J.A.2121*. What it proves is that someone told the prosecutor that Brian's information was the opposite of exculpatory, and his status as a witness therefore need not be disclosed. The prosecutor could not confirm she ever spoke to Brian, or that Ron Dyson told her anything of the sort, *J.A.1388,1420*, which leaves the case detective, Goldstein, as the most logical (if not only possible) source of this mis-information.[13]

---

[13] Goldstein contends that Ron Dyson spoke to the prosecutor directly, but this changes nothing. There is no evidence that Brokaw asked about, or that the two of them discussed, Brian's status as a possible witness. *J.A.1280-82*.

54

## 2. Suppression of the FBI Information Also Independently Supported the Jury's Verdict

Even Goldstein admitted that the leads, possible motives, and other information referred to in two FBI memos triggered *Brady* obligations. After waffling, Goldstein ultimately acknowledged that it would've violated Burgess' rights to withhold it. *J.A.929-32*.

Goldstein's admission was proper, if not unavoidable. Burgess was prosecuted under the theory that he got into a domestic argument which caused him to execute his girlfriend in her basement. The FBI memos posit an entirely different description of the crime. According to the FBI's sources, "[t]hree subjects were involved in the murder of Michelle Dyson," two black males and black female, and "Dyson was killed because of drug related problems. She may have blown a package or drugs and/or a money package." *J.A.2509*. The first FBI memo also refers to a perpetrator or witness who sells drugs at Greenmount and 27th, a corner controlled by Howard Rice. *J.A.1663-64*.[14]

This memo further provides that "Dyson's babysitter knows the details of the motives for the murder and preceding threats," and a barber at Hair Dimension, Sinclair Lane Shopping Center, who fathered children with the victim is a "drug underworld player" and "knows a lot about the background of Dyson's killers."

---

[14] Another FBI memo (PX124) admitted without objection, referred to Darius Curry (aka Pancake) as someone who "sells dope at Greenmount and 27th." *J.A.2511*.

*J.A.2509-10*. The second FBI memo states that Michelle Dyson's babysitter "witnessed numerous events and heard numerous conversations between the victim and others, which directly relate to the motive for the victim's murder." *Id*.

None of this information made it into any notes or reports in the BPD files. Goldstein admitted that he provided none of it to the prosecutor, *J.A.930,941*, and the prosecutor confirmed that she was completely in the dark about all of it. *J.A.1397-99*.

Crucially, the first FBI memo states that the information referred to above was "furnished to detectives at the BPD-Homicide Unit at (410) 396-2116," including the "case detective" who "advised that the information appeared to be accurate and resulted in leads on the case." *J.A.2509*. The second FBI memo states that "on 11/8/94, after 2130 hours," the "case detective, BPD Homicide Unit (410) 396-2116 was provided with the above-stated information." *J.A.2510*.

On appeal, Goldstein calls it "theoretically possible" that he was the case detective who received this information from the FBI, but nonetheless asks this Court to accept his testimony that he was not. He reasons that he should win because the converse proposition (that he did know about it) is nothing more than a "mere possibility." Br. 34. That argument turns the law on its head. To preserve a jury verdict, winning parties need not rule out every other possibility; the "verdict is permitted to stand unless ... no substantial evidence is presented to support the

award." *Stamathis v. Flying J, Inc.*, 389 F.3d 429, 436 (4th Cir. 2004).

That is a difficult showing under any circumstances, but certainly not one Goldstein made here. Most obviously, there was no dispute at trial that Goldstein was in fact the case detective for the Dyson homicide. *J.A.876-77,926; S.A.107-08*. In fact, he was the one and only detective working this investigation. *Id*. There was no one else assigned to it, period. *Id*.

That alone should suffice to permit the inference at issue, but there was also strongly corroborating evidence. While Goldstein denied ever speaking to anyone from the FBI about the information in these memos, Plaintiff introduced a set of notes in Goldstein's own handwriting that closely tracked these FBI memos. *J.A.2484*.

Goldstein's notes, for example, list Troy Williams, as the victim's "old boyfriend" who "works at hair dimension in Sinclair Lane Shopping Center," *id.*, the verbatim profile of the last witness listed in the first FBI memo. *Id*. Goldstein's notes then list "Barbara, B/F 20's" as a "babysitter, did Michelle's nails, lives near Michelle's old address," thereby corresponding closely to the FBI reference to the babysitter/neighbor/confidante. *Id*. The redacted name from the second FBI memo is the victim's "friend," just as is Patricia Brooks (the victim's best friend) from Goldstein's notes. *J.A.1152-53*. Considered in context, Goldstein's notes list the names of the individuals whose identities were redacted from the FBI exhibit, in the

precise order they appear no less. *See J.A.2124* (district court's explanation that "Goldstein's own notes closely track information in the FBI memos...").

Given the foregoing, the most obvious (if not the only) fair inference is that despite his disavowals, Goldstein: (a) did receive this briefing, just as the FBI memos suggest, and (b) he either inexplicably failed to document the substantive exculpatory facts, or else (and arguably more likely) he documented those exculpatory facts somewhere other than in the set of records that made their way into the official file that was provided to the criminal justice system. After all, Goldstein insisted that the policies and practices of the BPD did not require detectives to memorialize this kind of exculpatory information. *S.A.216-17*.

Confronted on the stand with the tight correlation between the FBI memos and his own handwritten notes, Goldstein attempted to explain his way out by making an important admission. According to Goldstein, the reason he recorded the names of the witnesses who by all appearances are referred to in the FBI memos is because, in his words, he developed this same information himself. *S.A.216-17*. This only dug his hole deeper. Crediting his own testimony, Goldstein independently developed the very information contained in the FBI memos, yet failed to make any reports or communications to the prosecutor explaining any of it, much less how he learned it. That hardly improves his *Brady* position.

On appeal, Goldstein asks this Court to re-weigh the evidence and make a factual finding that the person who represented himself to be case detective for the Dyson homicide was someone other than Goldstein. As he did with the jury, Goldstein asks this Court to conclude that the FBI essentially got misled by someone passing himself off as the case detective for the Dyson homicide, a person who then advised in response "that the [FBI's] information appeared to be accurate and resulted in leads on the case." *J.A.2509.*

Goldstein's argument relied on the proposition that the phone number listed in the FBI memos (410.396.2116) was not one at which Goldstein could have been reached. This proposition failed. After Goldstein tried to make this argument, Plaintiff introduced a memo from another BPD homicide case confirming that 410.396.2116 was in fact a phone number that could be used to reach BPD homicide detectives about their cases. *J.A.2508.*

Reviving another unsuccessful trial argument, Goldstein's Brief spins a story that the phone number listed on the memos supposedly belonged to someone named Butch Hodgson working in the Cold Case Squad. The only hook for this theory was the (long-retired) Sgt. Lehmann's testimony that he supposedly had an independent recollection that 410.396.2116 was the Cold Call Squad's phone number. This contention broke down on cross-examination, when Lehmann admitted that all these years later, he really had no genuine memory of the BPD Cold Case Squad's phone

number, which he presumably didn't call often. *J.A.1240-41*.

To be clear, Hodgson never testified at trial, and has never contended that he was the detective who received these FBI calls. The hypothetical that Hodgson was the person who took these FBI calls is literally just that, a hypothetical, one the jury could have, but was not required to, accept. *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 349 (4th Cir. 2014) ("We cannot say that there is an 'absolute absence of evidence' supporting the jury's determination").

Were there any lingering doubt, the testimony was that even assuming another detective had taken this call and somehow inadvertently given the FBI the impression that he, rather than Goldstein, was the Dyson case detective, there was no question that any information supplied by the FBI about the Dyson homicide would have been promptly routed straight to Goldstein, the detective was in charge. *J.A.686-87,700-01*. Goldstein truly has no response for that.

## VI. THE VERDICT WAS NOT THE PRODUCT OF BIAS, SYMPATHY, OR THANKSGIVING

The jury took under four hours to reach its verdict. Desperate to avoid the conclusion that Plaintiff's case was overwhelming, Goldstein speculates that perhaps Thanksgiving was a factor. In addition to inaccurate, the suggestion is disingenuous. Judge Bennett was fully prepared to conclude trial and close after Thanksgiving, but Goldstein (joined by Burgess) asked the Court to deliver closings

on November 21. *J.A.1571-73,1853,1923-24*. As it turned out, the jury finished deliberating with a full day to spare: the day before the day before Thanksgiving.

Goldstein's Br. at 4 also notes that after the verdict, the judge apologized to Burgess on behalf of the government for what he perceived to have been a violation of Burgess' rights. *J.A.2015*. Goldstein's suggestion that this gesture demonstrates bias, sympathy, or prejudice against law enforcement is misguided. Per the court's website, prior to his appointment by President George W. Bush, Judge Bennett was an AUSA and a long-time member of the Maryland National Guard. As a former federal prosecutor, he was not unduly sympathetic to criminal defendants, nor the least bit anti-law enforcement. To the contrary, the Defendants won so many disputes at trial that Goldstein was left with nothing viable to appeal. The only thing this apology "on behalf of the government" actually demonstrated was how powerful the evidence of the constitutional violations truly was.

## BURGESS' CROSS-APPEAL

## VII.   DISMISSAL OF THE *MONELL* CLAIMS WAS IMPROPER

Burgess' complaint pled that the BPD's policies and practices violated his rights in a manner actionable under *Monell v. Department of Soc. Srvs.*, 436 U.S. 658 (1978). *See* R.1 ¶¶53-80,118-122. After twice denying Rule 12(b)(6) motions to dismiss, the district court granted the BPD's third such motion following this Court's remand. That dismissal was without legal basis.

## A. Procedural History

The court denied the BPD's original motion to dismiss, R.36, concluding the *Monell* claims were plausibly pleaded, R.55 at 23-26. Before discovery, the BPD moved to bifurcate, arguing that *Monell* litigation should occur only after Burgess proved his rights were violated. R.58. The district court bifurcated and stayed the claim, stating they would "be resolved in a second trial, if necessary." R.68.

After the jury found for Burgess, he moved lift the *Monell* stay. R.371. That motion was denied, and the claims remained stayed throughout post-trial motions and during Goldstein's premature appeal. R.408,414,415. During the appeal, after insisting Burgess should voluntarily dismiss his *Monell* claims, R.418,419, the BPD again moved to dismiss. R.421. The district court again denied the motion. R.424.

This Court then dismissed Goldstein's appeal because the *Monell* claims remained unresolved. Doc. 68 at 3-4.

The BPD filed a third Rule 12(b)(6) motion. R.427. Burgess again opposed. R.430. This time, the district court granted the motion. R.434. While indicating the *Monell* claims were not technically moot, R.434 at 9 n.2, the court nonetheless dismissed them with prejudice because, in its view: (1) Burgess couldn't obtain additional relief by succeeding, *id.* at 7-10; and (2) the *Monell* claims "lack[ed] merit" such that the evidence did "not support the submission" to a jury, *id.* at 10-11.

Burgess cross-appealed. R.439.

**B.    There Was No Basis to Dismiss the *Monell* Claims**

The dismissal of Burgess's *Monell* claims was without any legal basis. As the BPD acknowledged, they were not moot. R.434 at 9 n.2. The BPD's motion was filed under Rule 12(b)(6), not Rule 12(b)(1). And there can be no reasonable dispute that Article III jurisdiction was sound. Burgess had a concrete interest in his §1983 claims against the BPD, and the BPD did not accept a judgment against it or make a Rule 68 offer satisfying Burgess's demands. *Campbell-Ewald Co. v. Gomez*, 136 S.Ct. 663, 669-72 (2016); *Swanigan v. Chicago*, 775 F.3d 953, 960-62 (7th Cir. 2015).

Moreover, the district court had twice rejected Rule 12(b)(6) motions, concluding that the *Monell* claims were plausibly pleaded under Rule 8. R.55,424. The *Monell* claims were stayed without discovery from that point until they were ultimately dismissed.

Rule 12(b)(6) tests the sufficiency of a complaint, and "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N. Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). The court's dismissal thus cannot be viewed as one for failure to plausibly plead a claim--and the court's opinion did not suggest that was the basis of the

dismissal in any event.[15]

In addition, the court never suggested it was converting the Rule 12(b)(6) motion into one for summary judgment under Rule 12(d). Nor could it have. The parties had not conducted any discovery on the *Monell* claims. *Greater Baltimore Center for Pregnancy Concerns v. Mayor and City Council of Baltimore*, 721 F.3d 264 (4th Cir. 2013) (a district court must give some indication of a Rule 12(d) conversion, and parties must first have a reasonable opportunity for discovery). Nor could the court have construed BPD's motion as one under Rule 50, as Burgess had not been heard at all (let alone fully heard at trial) on his *Monell* claims. Fed.R.Civ.P. 50(a).

The court also decided it could dismiss the claims based on the premise that Burgess had obtained all possible relief when he succeeded at trial against Goldstein. R.434 at 5-10. But other than mootness, which by all accounts does not apply here, there is no principle of federal law supporting the district court's disposition. The cases that the court cited simply stand for the proposition that when Congress has *not* provided for a judicial remedy, a case can be dismissed under Rule 12(b)(6). *Id.* at 5-6 (citing *Davis v. Passman*'s discussion of *Bivens* remedies; the Fifth Circuit's evaluation in *Armstrong* of which injuries are compensable under the ADA; and this

---

[15] Relatedly, the BPD's successive Rule 12(b)(6) motion was a procedurally improper vehicle at that stage, after the pleadings had long been closed. Wright & Miller, Federal Practice & Procedure § 1361.

Court's decision in *Eastman*--now overruled on this point--about damages available under the Rehabilitation Act of 1973). This is plainly not a case where a judicial remedy is unavailable, where Congress has provided for direct, non-derivative liability and damages against municipalities via §1983. *Monell*, 436 U.S. at 694.

Moreover, the district court was incorrect that Burgess has nothing to more gain from the *Monell* claims, and it mis-assessed the weight of authority from other circuits considering *Monell* claims after a verdict on individual lability. On the former point, a *Monell* verdict would not merely provide punitive damages; it would provide Burgess an independent basis to support his $15 million judgment, which is a thing of undeniable value. *Int'l Ground Transp. v. Mayor & City Council of Ocean City*, 475 F.3d 214, 219 (4th Cir. 2007). Illustrating the value of an independent judgment, the BPD has not accepted entry of any judgment against it (despite it and the City's agreement to indemnify, R.427-1 at 2), and Goldstein is seeking reversal of the judgment against him.

Further, a *Monell* judgment would incentivize systemic reform, avoiding future wrongful convictions, and have preclusive effect against the BPD. *Owen v. City of Independence*, 445 U.S. 622, 651 (1980) ("A damages remedy against the offending party is a vital component of any scheme for vindicating cherished constitutional guarantees, and the importance of assuring its efficacy is only accentuated when the wrongdoer is the institution … established to protect the very

rights it transgressed."); *Amato v. Saratoga Springs*, 170 F.3d 311, 317–18 (2d Cir. 1999) ("A judgment against a municipality not only holds that entity responsible" but also encourages reforms that led to the constitutional violations). In contrast, bifurcating plausible *Monell* claims and then dismissing them after resolution of individual claims—*regardless of whether individuals are found liable*—renders municipalities absolutely immune, a result that cannot be squared with the Supreme Court's *Monell* case line.

And so other courts have concluded. The Seventh Circuit in *Swanigan* reversed a decision to dismiss a bifurcated *Monell* claim *sua sponte* after a verdict against individual officers. 775 F.3d at 963. Both the Second and Ninth Circuits have concluded that *Monell* claims cannot simply be dismissed after resolution of claims against individuals. *Amato*, 170 F.3d at 321; *Ruvalcaba v. Los Angeles*, 167 F.3d 514, 524 (9th Cir. 1999). The Tenth Circuit's contrary harmless error determination in *Manzanares v. Albuquerque*, 628 F.3d 1237 (10th Cir. 2010), did not grapple with the issues identified above. This Court should join the majority of other circuits in holding that *Monell* claims cannot be dismissed without a sound procedural or legal basis after a plaintiff's verdict.

# CONCLUSION

Jury verdicts are rarely overturned, and the district court correctly concluded that Goldstein offered nothing that legitimately justifies that relief here. The Court should affirm the judgment on the verdict, and remand for discovery and trial on the *Monell* claim.

RESPECTFULLY SUBMITTED,

_____/s/ Jon Loevy_____
*Counsel for Mr. Burgess*

Jon Loevy
*Counsel of Record*
Gayle Horn
Steven Art
Theresa Kleinhaus
LOEVY & LOEVY
311 North Aberdeen Street
Chicago, Illinois 60607
(312) 243-5900
jon@loevy.com

## CERTIFICATE OF COMPLIANCE WITH
## CIRCUIT RULE 32(c)

I, Jon Loevy, hereby certify, pursuant to Circuit Rule 32(c), that the foregoing

RESPONSE BRIEF OF PLAINTIFF-APPELLEE SABEIN BURGESS complies

with the type-volume limitation set forth in Circuit Rule 32(c) because it contains

15,294 words, excluding those portions of the brief listed in Federal Rule of

Appellate Procedure 32(a)(7)(B)(iii) that do not count toward the word limitation. In

preparing this certificate, I relied on the word count tool of the word-processing

system used to prepare the brief, Microsoft Word 2007.

 /s/ Jon Loevy
*Counsel for Mr. Burgess*

Jon Loevy
*Counsel of Record*
Gayle Horn
Steven Art
Theresa Kleinhaus
LOEVY & LOEVY
311 North Aberdeen Street
Chicago, Illinois 60607
(312) 243-5900
jon@loevy.com

# CERTIFICATE OF SERVICE

I, Jon Loevy, hereby certify that I served the OPENING/RESPONSE BRIEF

OF PLAINTIFF-APPELLEE SABEIN BURGESS on October 4, 2019, using the

CM/ECF system, which effected service on all counsel of record for the

Defendants-Appellees.

 /s/ Jon Loevy
*Counsel for Mr. Burgess*

Jon Loevy
*Counsel of Record*
Gayle Horn
Steven Art
Theresa Kleinhaus
LOEVY & LOEVY
311 North Aberdeen Street
Chicago, Illinois 60607
(312) 243-5900
jon@loevy.com